**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**WESTERN DIVISION**

| | |
|---|---|
| LaTONY D. BOGAN (M04627), | ) |
| Plaintiff, | ) |
| v. | ) No. 3:23 C 50115 |
| ANN GANGER, SCOTT NAILOR, RHYS HOWELLS, and DYLAN WALLS, C/O, | ) Judge Rebecca R. Pallmeyer |
| Defendants. | ) |

### MEMORANDUM OPINION AND ORDER

Pro se Plaintiff LaTony Bogan was a prisoner incarcerated at the Illinois Department of Corrections ("IDOC") facility in Dixon, Illinois. On May 13, 2021, corrections officers suspected that Bogan had been using an object to damage the lock on his cell door; Bogan claims they subsequently conducted a strip search of him. Now on parole,[1] Bogan alleges in this lawsuit under 42 U.S.C. § 1983 that the search violated his Eighth Amendment right to be free from cruel and unusual punishment. Defendants have moved for summary judgment. As explained below, this motion is granted.

### BACKGROUND[2]

At the time of the events giving rise to this lawsuit, Mr. Bogan was incarcerated at the Dixon Correctional Center in Dixon, Illinois. (DSOF ¶ 1.) The Dixon facility has historically experienced trouble with the locking mechanism on cell doors—some prisoners are able to

---

[1] *See* LaTony Bogan Internet Inmate Status, ILL. DEP'T OF CORRECTIONS, https://www.idoc.state.il.us/subsections/search/inms_print.asp?idoc=M04627 (last accessed Dec. 12, 2025).

[2] In considering a motion for summary judgment, the court construes all facts in the light favorable to Mr. Bogan, the non-moving party. Except where otherwise indicated, the facts included in this section are taken from Defendants' Local Rule 56.1(a)(2) Statement of Facts [100] ("DSOF"), Bogan's response to Defendant's Statement of Facts [115] ("Pl. Resp. to DSOF"), and the exhibits attached to both filings. Mr. Bogan did not file a Statement of Additional Material Facts, as authorized by LR 56.1(b)(3).

manipulate the locks using magnets to leave their cells without authorization. (*Id.* ¶ 11; Nailor Decl. [100-4] ¶ 15.) Bogan acknowledges that he has been caught, at least eleven times, exiting his cell in such a fashion.[3] (Pl. Resp. to DSOF ¶ 12.)

On May 13, 2021, at around 3:00 p.m., an alert appeared on the prison's control panel, indicating a malfunction on the lock to Bogan's cell. (IDOC Disciplinary Rep. [100-8] at 3.) According to a disciplinary report he prepared, Corrections Officer Rhys Howells (now deceased) went to investigate.[4] (*Id.*; DSOF ¶ 15.) In a report he prepared at the time, Howells recounted that as he approached the cell, he observed Bogan reaching into the lock, removing an unknown object, and hiding it behind his coat. (DSOF ¶ 16.) The report states that Howells demanded that Bogan give him the object, but Bogan refused, denying that there was anything to hand over. (*Id.* ¶¶ 17–20.) The two then briefly argued about the "true cause of the locking mechanism to [the] cell malfunctioning." (DSOF ¶ 18.) Bogan reportedly "refused multiple direct orders to hand over the item and refused to move to the back of the cell so that [Howells] could check the coat." (IDOC Disciplinary Rep. [100-8] at 3.) Bogan largely confirms the factual account that appears in Howells's report; he acknowledges that Howells believed he was using an object to manipulate the lock, that they had a brief argument about it, and that he refused orders to turn over the object. (Pl. Resp. to DSOF ¶¶ 15–17.) But Bogan maintains now (as he did then) that the lock was malfunctioning of its own accord without any involvement on his part, and that there was "nothing for [him] to hand over." (*Id.* ¶¶ 11, 16, 17.)

---

[3] This includes four violations prior to the May 13 incident that gave rise to this lawsuit, and at least seven following that date. (Pl. Resp. to DSOF ¶ 12.) The eleven total incidents are on: August 11, 2020; November 1, 2020; January 12, 2021; February 3, 2021; May 20, 2021; June 3, 2021; June 17, 2021; October 12, 2021; December 9, 2021; February 6, 2022; and August 14, 2022. (*Id.*)

[4] Mr. Bogan does not challenge the admissibility of Howells's report and, as explained in the text, the court concludes that even without reliance on Howells's account, the record supports summary judgment for Defendants.

After the interaction with Bogan, Howells returned to the control panel and, as he reported, notified unnamed members of the prison's "command staff." (IDOC Disciplinary Rep. [100-8] at 3.) He wrote in his report that the panel "show[ed] green" upon his return, suggesting that Bogan's removal of the object resolved the lock's error. (*Id.*) Later that day, according to both parties, Lieutenant Ann Ganger ordered Sergeant Scott Nailor to search Bogan's cell, among several others. (Pl. Resp. to DSOF ¶ 20; Nailor Decl. [100-4] ¶ 17.) Ganger has no independent recollection of issuing this order, but she affirmed that Howells' report was "absolutely the type of ticket that would have prompted me as a lieutenant to order a cell search of Mr. Bogan's cell." (Ganger Decl. [100-3] ¶¶ 9–13.)

At 7:00 p.m., Officer Howells and Sergeant Nailor arrived at Bogan's cell to conduct the search. (Pl. Resp. to DSOF ¶ 21.) What happened next is disputed. In a written declaration, Nailor claims that he conducted a "pat down" of Bogan, but did not conduct an unclothed search.[5] (Nailor Decl. [100-4] ¶¶ 21–23.) Bogan contends that Nailor entered his cell and said, "I heard that you had an altercation with my friend." (Pl. Dep. [100-1] at 40:10.) Nailor then ordered him to undress, and conducted a full body visual strip search. (*Id.* at 40:13.) Bogan describes this search as follows:

> Nailor made Plaintiff repeatedly lift his penis, lift his testicles, and to turn around bend over and spread his buttocks multiple times and then telling him to hold that position with his butt spread open.

(Opp'n [114] ¶ 5.) Bogan's cellmate David King gave a deposition in which he confirmed that Nailor entered the cell and subjected Bogan to a strip search. (DSOF ¶¶ 29–31; King Dep. [100-2] at 22:16–25:9.) But King did not personally observe the search; he testified that he turned to face the wall as Bogan undressed. (*Id.* at 22:23–22:24, 26:5–27:8.)

---

[5] Nailor's declaration states: "I did not conduct an unclothed search of Plaintiff that day. During my entire 26 years working as a correctional officer, I never conducted an unclothed search of an individual in custody in their cell." (Nailor Decl. [100-4] ¶¶ 22–23.) Officer Howells's report makes no mention of any search. (*See* IDOC Disciplinary Rep. [100-8].)

3

The parties also dispute who was present during the encounter. They agree that the two officers, Nailor and Howell, and the two inmates, Bogan and King, were there, but Bogan contends that a third officer, Dylan Walls, also entered the cell to "relieve[]" Howells, who was scheduled to go on break. (Pl. Resp. to DSOF ¶¶ 23, 29.) Defendants flatly deny that Walls was ever present. (DSOF ¶¶ 25, 26.) Walls submitted a declaration in which he denied participating in the search, and Nailor claims that "the only other officer [he recalls] being present for Plaintiff's cell search was Officer Howells." (*See* Walls Decl. [100-5] ¶ 11; Nailor Decl. [100-4] ¶ 19.) Assuming that Walls was in fact present, there is no evidence that he took any action relating to the alleged search.

All agree that after the search of Bogan's person, both Bogan and King were escorted from their cell to the prison's dayroom. (DSOF ¶ 32.) Nailor then conducted an exhaustive search of the cell. He confiscated a modified hotpot, which belonged to King, but seized no other contraband. King later was subject to written discipline for his possession of the illicit hotpot. (Pl. Resp. to DSOF ¶ 34.)

Later that evening, Bogan contacted IDOC's Prison Rape Elimination Act ("PREA") hotline to report the encounter.[6] IDOC conducted an internal investigation led by Internal Affairs Lieutenant Arthur Manzano. (DSOF ¶ 36.) The persons he interviewed—Bogan, King, Nailor, and Howells—gave statements essentially consistent with what is set forth above: Bogan and King claimed Bogan was subject to a strip search, while Nailor and Howells denied it. (*See generally* Manzano Rep. [102].) Based on these interviews and the officers' incident reports, Manzano determined that Nailor did not touch Bogan or make sexual comments, and thus

---

[6] The PREA " is a federal law that prohibits and seeks to eliminate sexual abuse and sexual harassment in correctional institutions and community corrections settings." *See Prison Rape Elimination Act of 2003*, ILL. DEP'T OF Corrections, http://idoc.illinois.gov/programs/ prisonrapeeliminationactof2003.html#:~:text=How%20to%20Report%20Institutional%20Sexual, %3A%20217-558-4013 (last accessed Dec. 12, 2025.) According to IDOC's website, "individuals in custody can report by submitting a request slip, a grievance, telling a trusted staff member, or asking a family member or friend to call the report line." *Id.*

concluded that a "PREA allegation did not occur." (*Id.* at 3.) Bogan disagrees with Manzano's findings, and accuses him of having "lied in his report." (Pl. Resp. to DSOF ¶ 39.)

This lawsuit followed. Mr. Bogan filed his *pro se* Complaint [1] on April 7, 2023, alleging that the strip search was conducted to retaliate against him for the earlier conflict with Howells, in violation of the Eighth Amendment. After initial screening, Bogan filed an amended complaint [8] on May 31, 2023. Days later, Defendant Howells died. (*See* Suggestion of Death [42].) Noting that "identifying a party to substitute for Defendant Howell[s] is not a task that an incarcerated person is likely able to undertake from prison," Judge Reinhard of this court, who was then presiding over the case, recruited Attorney Andrew Szocka to represent Bogan for the limited purpose of identifying a substitute party. (Order [33].) At Attorney Szocka's request, this court later appointed "Public Administrator and Public Guardian of Ogle County, Sharon Rudy," to serve as Special Representative for the deceased Howells. (*See* Order [62].) Attorney Szocka subsequently withdrew as counsel. Rudy has yet to enter an appearance in this case, and according to Defendants, Mr. Bogan has made no effort to serve her. (DSOF ¶ 6 n.1.) Defendants now seek summary judgment.

## LEGAL STANDARD

Summary judgment is appropriate when there is no genuine dispute of material fact, and the movant is entitled to judgment as a matter of law. *Dunn v. Menard, Inc.*, 880 F.3d 899, 905 (7th Cir. 2018). A genuine issue of material fact exists only if "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). In considering a motion for summary judgment, the court construes facts and draws all reasonable inferences in favor of the non-moving party. *Burton v. Downey,* 805 F.3d 776, 783 (7th Cir. 2015).

The party moving for summary judgment bears the burden of establishing that the summary judgment standard is met, and if the moving party does so, the opposing party must present evidence sufficient for a jury to find in their favor on all matters on which they bear the

5

burden of proof. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). A party opposing summary judgment must produce affirmative evidence showing there is more than a "metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986). They may not rest solely upon allegations in the pleadings. *Anderson*, 477 U.S. at 256–57 (1986). Likewise, speculation "cannot create a genuine issue of fact that defeats summary judgment" and "is insufficient to defeat a summary judgment motion." *Flowers v. Kia Motors Fin.*, 105 F.4th 939, 946 (7th Cir. 2024).

## **DISCUSSION**

At the threshold, the court notes that Nailor appears to be the only proper defendant in this case. Howells is deceased, and Bogan has made no effort to serve the Special Representative. As to Defendant Ganger, Bogan admits that she was not present during the search (Pl. Resp. to DSOF ¶ 24), and has presented no evidence that she ordered a strip search or was in a position to intervene to stop it. The only evidence in support of Bogan's contention that Officer Wells was present at all is hearsay: Bogan says that an individual known as "CO Smith" told him that Walls was there. (Pl. Dep. [100-1] at 84:19–85:12.) No statement from CO Smith is in the record. Accordingly, Defendants Howells, Ganger, and Walls are each dismissed from this case.

Defendant Nailor maintains that there was no unclothed search of Bogan; for purposes of this motion, however, the court assumes that Sergeant Nailor did conduct a strip search of Bogan, and that Bogan's description of that search is accurate. Even so, Nailor argues that the court should grant summary judgment because (1) if such a search had taken place, it would not violate the Eighth Amendment because it was related to a legitimate penological interest, and (2) in the alternative, the officers are entitled to qualified immunity. (Mem. [99] at 5–9.) The court agrees with both arguments.

I. **Eighth Amendment Claim**

The Constitution gives prison officials wide latitude in searching inmates' persons. *Florence v. Bd. of Chosen Freeholders of Cnty. of Burlington*, 566 U.S. 318, 326-330 (2012). "[A] prisoner's expectation of privacy is extremely limited in light of the overriding need to maintain institutional order and security." *Meriwether v. Faulkner*, 821 F.2d 408, 418 (7th Cir. 1987) (citing *Bell v. Wolfish*, 441 U.S. 520, 537, 558–60 (1979)). For this reason, a strip search of a prisoner "violates the Eighth Amendment only if it is 'maliciously motivated, unrelated to institutional security, and hence totally without penological justification.'" *Jones v. Anderson*, 116 F.4th 669, 678 (7th Cir. 2024) (citing *Whitman v. Nesic*, 368 F.3d 931, 934 (7th Cir. 2004)). "To overcome summary judgment," Mr. Bogan must "produce evidence showing that the officers conducted the search in a harassing manner intended to humiliate and inflict psychological pain." 116 F.4th at 678 (citation and internal quotation marks omitted).

A strip search does not run afoul of the Eighth Amendment if it is plainly related to locating contraband, a legitimate penological purpose.[7] Bogan himself acknowledges that Officer Howell believed that he was concealing an object used to tamper with his cell's lock—a reasonable conclusion, given the alert in the prison's control panel, and the fact that Bogan had been caught several times exiting his cell without authorization. (Pl. Resp. to DSOF ¶ 12.) When Bogan refused to hand over the object, the officers had a legitimate basis for searching Bogan's cell and person to locate contraband. Ensuring that cell doors are locked appropriately is unquestionably related to security of the prison, and searching for contraband "that threatens the safety and security of the prison" is "penologically justified." *Chatman v. Gossett*, 766 F. App'x 362, 364 (7th Cir. 2019) (involving a search for "ingredients for alcohol production"). Officers would be expected to investigate the cause of a malfunctioning lock, and given the circumstances here, a strip search

---

[7] While Bogan does not appear to raise a Fourth Amendment claim, the court notes that "strip searches of inmates performed for security purposes are reasonable as a general matter" under the Fourth Amendment. *West v. Radtke*, 48 F.4th 836, 853 (7th Cir. 2022)

7

is not "so totally without penological justification that it results in the gratuitous infliction of suffering."[8]  *Calhoun v. DeTella*, 319 F.3d 936, 939 (7th Cir. 2003) (quoting *Gregg v. Georgia*, 428 U.S. 153, 173, 183 (1976)).

Bogan contends that the true purpose of the search was not to locate contraband, but to maliciously "punish him for arguing with [Nailor's] fellow officer (Defendant Howells)." (Opp'n [114] ¶ 1.)  But Bogan's speculation about Nailor's motivations are insufficient to overcome the uncontroverted facts that establish that (1) the officers reasonably believed Bogan to be concealing contraband in his cell, and (2) Bogan had refused to submit to a search earlier in the day. (*See* Pl. Resp. to DSOF ¶¶ 15–17; IDOC Disciplinary Rep. [100-8] at 1.)  These circumstances provided the guards with ample justification to conduct a strip search of his person. In fact, according to Bogan himself, the argument with Howells was prompted by Howells's belief that he observed Bogan manipulating his cell lock—that is, the observation that Nailor identifies as the basis for a search. (Opp'n [114] ¶ 2; Nailor Decl. [100-4] ¶¶ 12–17.)  Bogan has presented no evidentiary basis for his insistence that it was the argument (rather than the circumstances underlying the argument) that prompted a search; at most, he asserts that Nailor made reference to the earlier "altercation" with Howells. (Pl. Dep. [100-1] at 40:10.)  But that passing comment alone is not inconsistent with the search having a legitimate penological purpose, and does not negate the uncontested institutional security justifications for searching Bogan's person.

Bogan's real argument is that he did not, in fact, have contraband in his cell, meaning that Howells's accusation was incorrect, that Howells should have believed him, and there should have been no search at all. (Opp'n [116] at 63.)  But the fact that the officers found nothing in their search does not establish an Eighth Amendment violation.  Howells may have been

---

[8] Bogan claims that institutional security justifications are "exclusively reserved for the First Amendment, therefore in an Eighth Amendment context the Defendants cannot hide behind this defense." (Opp'n [114] ¶ 9.)  This argument is foreclosed by binding precedent, as the Seventh Circuit has recognized that institutional security justifications factor into whether a punishment is justified in the Eighth Amendment context.  *See, e.g.*, *Chatman*, 766 F. App'x at 364, *Whitman*, 368 F.3d at 934.

mistaken, but the Eighth Amendment is not violated every time a prisoner is searched based on mistaken factual information.

Finally, Bogan claims that Nailor conducted the search in a matter designed to humiliate and demean him, and intended it to result in the "'gratuitous infliction of suffering.'" (Opp'n [114] ¶ 6 (quoting *Calhoun*, 319 F.3d at 939).) He points to the presence of his cellmate during the search, as well as the fact that he was ordered to lift his penis more than once and told to stand with his buttocks spread for "more time than . . . was appropriate for a strip search." (*Id.*; Pl. Dep. [100-1] at 40:14–40:24.) King himself testified that he faced the wall during the search; but even if that were not the case, the presence of a cellmate would not by itself render an otherwise allowable strip search unlawful. *See Chatman*, 766 F. App'x at 363 (concluding that two separate strip searches of male prisoners in view of other male prisoners did not violate Eighth Amendment). Nor do orders purportedly given by Nailor (to enable inspection of Bogan's penis and buttocks) appear to be unusual in the context of the strip search. "There is no question that strip searches may be unpleasant, humiliating, and embarrassing to prisoners, but not every psychological discomfort a prisoner endures amounts to a constitutional violation." *Calhoun v. DeTella*, 319 F.3d 936, 939 (7th Cir. 2003). This evidence alone does not support a jury finding that the search was excessively cruel or punitive.

## II.    Qualified Immunity

Having concluded that a strip search, if it occurred, did not violate the Constitution, the court need not address qualified immunity at length, but the record supports this defense as well. The doctrine of qualified immunity "'gives government officials breathing room to make reasonable but mistaken judgments,' and 'protects all but the plainly incompetent or those who knowingly violate the law.'" *Messerschmidt v. Millender*, 565 U.S. 535, 546 (2012) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011)). Qualified immunity is an affirmative defense, *Sinn v. Lemmon*, 911 F.3d 412, 418 (7th Cir. 2018), so once raised, "the plaintiff bears the burden of defeating it by showing: (1) the defendant violated a constitutional right, and (2) that right was clearly

established at the time of the alleged violation." *Id*.; *see Jackson v. Anastasio*, 150 F.4th 851, 856 (2025) (setting out two-prong qualified immunity test). "A failure to show either is fatal for the plaintiff's case." *Archer v. Chisholm,* 870 F.3d 603, 613 (7th Cir. 2017).

To defeat Nailor's qualified immunity defense, therefore, Bogan must identify a precedential case clearly establishing that the Eighth Amendment is violated where prison guards conduct an unclothed, visual inspection of a prisoner's genitals, in the presence of a prisoner's cellmate, to search for contraband that the prisoner denies possessing. To be sure, Bogan need not identify authorities that are directly on point, but "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987). This means that "existing precedent must have placed the statutory or constitutional question beyond debate." *Kisela v. Hughes*, 584 U.S. 100, 104 (2018), citing *White v. Pauly*, 580 U.S. 73, 79 (2017).

Bogan cannot meet this burden. He cites three cases—*Campbell v. Miller*, 499 F.3d 711 (7th Cir. 2007); *Mary Beth G. v. City of Chicago*, 723 F.2d 1263 (7th Cir. 1983); *Washington v. Andrews*, No. 3:22 C 50045, 2025 WL 885692 (N.D. Ill. Mar. 21, 2025)—but none present circumstances analogous to this case. (Opp'n [116].) *Campbell* and *Mary Beth G.* concern the lawfulness of strip searches of arrestees under the Fourth Amendment, and thus have no bearing on the Eighth Amendment claims raised by an incarcerated person. *See Campbell*, 499 F.3d at 711 (concluding that body cavity search of individual arrested for possession of marijuana potentially violated Fourth Amendment where arresting officers conducted search in an "open" backyard and no exigent circumstances existed); *Mary Beth G.*, 723 F.2d at 1263 (concluding that body cavity searches as a matter of course for women detained in lock-up for misdemeanor offenses violated Fourth Amendment where the women were not inherently dangerous and there was no individualized suspicion of concealed contraband).

The third case, *Washington*, 2025 WL 885692, post-dates the conduct at issue here and is not controlling. [9] And it is obviously distinguishable: The plaintiff in *Washington* was a prisoner who was singled out for a pat-down search. After he complained about being singled out, the involved officer announced that plaintiff would instead be subject to a strip search, allegedly commenting that "I'm going to show you what a real pat search looks like—a real shakedown is." *Id.* at *3. The search was then conducted in a public shower area, in full view of other inmates. *Id.* at *3, *7. Later, the only cause the officer could articulate for the search was that the prisoner "would not stand still," which the officer viewed as "an indicator of possibly something being hid." *Id.* at *3. In the resulting lawsuit, this court denied summary judgment, noting that the evidence could support a jury finding that the officer "conducted the strip search without penological justification and with an intent to harass or humiliate" the plaintiff, especially since the search was conducted in a public area. *See id.* at *7. Here, in contrast, Bogan was searched in the privacy of his own cell, while his cellmate's back was turned; and Sergeant Nailor had a clear and legitimate penological purpose for strip-searching Mr. Bogan.

Bogan also argues that, in lieu of a directly analogous case, that "[r]egardless of penological matters, the defendants could not have reasonably believed that their decision to strip search plaintiff in front of his [cellmate], that they would be acting within means of the law." (Opp'n [116] ¶ 3 (citing *Abbott v. Sangamon Cnty., Ill.*, 705 F.3d 706 (7th Cir. 2013)).) True, there are situations where "the [officers'] conduct is so egregious and unreasonable that, notwithstanding the lack of an analogous decision, no reasonable officer could have thought he was acting lawfully." *Abbott*, 705 F.3d at 724; *see also Hope v. Pelzer*, 536 U.S. 730, 741 (2002). But this

---

[9] A decision of a district court, even this one, does not have the force of clearly established law for purposes of qualified immunity. *Camreta v. Greene*, 563 U.S. 692, 709 n.7 (2011). And even if precedential, a decision that post-dates the conduct could not have given the officers fair notice.

is not one of those cases.  To the contrary, as explained above, it is well-established in the Seventh Circuit that unclothed searches of prisoners are often constitutionally permissible.  The facts at issue here, while certainly unpleasant, are a far cry from the egregious circumstances that typically warrant invocation of this "obviousness" standard.  *Cf. Hope*, 536 U.S. at 741. *id.* (holding that officers were not entitled to qualified immunity after handcuffing an inmate to a so-called "hitching post" for seven hours in extreme heat); *Taylor v. Riojas*, 592 U.S. 7, 7–10 (2020) (per curiam) (same, in a case where a prisoner was locked in a cell covered in "massive amounts of feces," and forced to "sleep naked in sewage").

For these reasons, even if the record could support a jury finding that Nailor violated Bogan's rights during the strip search, summary judgment would nevertheless be warranted on on the basis of qualified immunity.

## CONCLUSION

Claims against Defendants Howell, Ganger, and Wells are dismissed.  Nailor's motion [98] for summary judgment is granted.  The Clerk is directed to enter judgment in favor of Nailor and against Plaintiff Bogan.

ENTER:

Dated:  December 17, 2025

_____
REBECCA R. PALLMEYER
United States District Judge